# COMMONWEALTH of Pennsylvania, Appellee,

## v.

## Muhammad DAVIS, Appellant.

Superior Court of Pennsylvania.

Submitted July 26, 2004.

Filed Oct. 26, 2004.

Janis Smarro, Philadelphia, for appellant.

Hugh J. Burns, Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: STEVENS, BOWES, and POPOVICH, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted Appellant of murder in the first degree,[1] aggravated assault,[2] five counts of robbery,[3] four counts of possessing an instrument of crime,[4] and violating the uniform firearms act.[5] We affirm.

¶ 2 On December 19 and 20, 1999, Appellant committed five armed robberies within a six-seven block radius in Center City Philadelphia; during those robberies, one victim was shot in the knee, and another was shot in the head and killed. N.T. 4/16/02 at 9–24; N.T. 9/9/02 at 142–51;[6] N.T. 9/10/02 at 9–20, 40, 66, 86–89, 117. Appellant was arrested on December 23, 1999, when Philadelphia Police Officers Caprara and Cavalieri observed Appellant remove a gun from the waistband of his pants and begin to approach from behind two unknown individuals who were unloading items from a parked car. N.T. 9/11/02

---

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S.A. § 2702.

3. 18 Pa.C.S.A. § 3701.

4. 18 Pa.C.S.A. § 907.

5. 18 Pa.C.S.A. § 6106.

6. We note that the Notes of Testimony for September 9, 2002, are mistakenly dated September 8, 2002. We will use the correct date.

at 3–33. The Officers exited their vehicle, identified themselves as police officers, and ordered Appellant to stop. N.T. 9/11/02 at 3–33. Appellant fled down the street but was caught by the Officers and a struggle ensued. N.T. 9/11/02 at 3–33. Appellant was able to escape after punching Officer Cavalieri in the face and kicking Officer Caprara in the thigh. N.T. 9/11/02 at 3–33. As Appellant ran down the street he accidentally dropped his gun which was recovered by Officer Cavalieri. N.T. 9/11/02 at 3–33. Officer Caprara radioed for assistance and Police Officers Dawsonia and Norman responded to the call. N.T. 9/11/02 at 3–33. Officers Dawsonia and Norman grabbed Appellant who continued to struggle and punch them. N.T. 9/11/02 at 33–48. During the struggle, Appellant continually reached towards his waistband; believing that he was attempting to retrieve a gun, Officer Dawsonia told her partner, to "[j]ust back up, I am going to shoot him." N.T. 9/11/02 at 33–48. Appellant ceased to resist and said, "I don't have the gun anymore. I threw it. I am not going to rob anybody else." N.T. 9/11/02 at 33–48.

¶ 3 Following his arrest, Appellant waived his right to remain silent and provided several written statements and a videotaped statement in which he admitted his involvement in the five robberies, as well as the shooting of robbery victim Barry Fritchman and the murder of Robert Reitz. N.T. 9/11/03 at 70–158. Robbery victim, Dr. Leonard Levine, identified Appellant in a photo array, at his preliminary hearing, and at trial, but was unable to identify Appellant in a line-up. N.T. 9/9/02 at 141–80. Robbery victims, Bradley Hoff and Barry Fritchman, identified Appellant in a line-up, at his preliminary hearing,

and at trial. N.T. 4/16/02 at 9–24; N.T. 9/10/02 at 8–38. Robbery victim Michael Drolet was unable to identify Appellant and did not testify during the proceedings.

¶ 4 A preliminary hearing took place on February 24, 2000, after which Appellant was bound over for trial. As the Commonwealth sought the death penalty, one attorney was appointed to represent Appellant during the guilt phase of the trial, and a second attorney was appointed to represent Appellant during the penalty phase. On September 14, 2001, Appellant asked that new counsel be appointed to represent him during the guilt phase. N.T. 9/14/01 at 3. Appellant complained that his attorney, Mr. McGill, did not come to see him and would not listen to him.[7] N.T. 9/14/01 at 3–12. The trial court granted Appellant's request and appointed John Cotter to represent Appellant at trial. On April 16, 2002, the trial testimony of robbery victim Bradley Hoff was videotaped, as Mr. Hoff would not be available to testify at trial. On September 3, 2002, a hearing took place on Appellant's motion to suppress his pre- and post-arrest statements. On September 5, 2002, the trial court denied Appellant's motion to suppress. N.T. 9/5/02 at 129–31.

¶ 5 Jury selection began on September 4, 2002 and continued through September 6, 2002. The jurors who were selected on September 4, 2002, were told that the trial would commence on September 10, 2002, but were told to contact the court prior to that date to make sure that there were no schedule changes. On September 5, 2002, the trial court announced that there had been a change, and that trial would commence on September 9, 2002. N.T. 9/5/02 at 29–30.

7. We note that Mr. McGill was the second individual who was appointed to represent Appellant. N.T. 9/14/01 at 12–13. The rec-

ord does not reflect the reason for the withdrawal of Appellant's first counsel, a Mr. Stewart. N.T. 9/14/01 at 12–13.

¶ 6 On September 9, 2002, the trial court informed the parties that two of the selected jurors had not appeared. One of the jurors had contacted the court and stated that he was unable to serve because his employers would not compensate him while he was on jury duty. N.T. 9/9/02 at 3–8. The whereabouts of the second juror were unknown and the court was unable to locate her. N.T. 9/9/02 at 3–8. After some discussion, the parties agreed that the two alternate jurors would replace the missing jurors and a new *voir dire* would be held so that they could select new alternate jurors. N.T. 9/9/02 at 3–76. Following the selection of the alternate jurors, Appellant requested that his third trial counsel be removed because counsel allegedly failed to listen to his instructions with respect to several pre-trial motions. N.T. 9/9/02 at 94–99. The trial court declined the request. N.T. 9/9/02 at 94–99. On September 17, 2002, Appellant was found guilty of all charges.

¶ 7 The penalty phase took place on September 18, 2002, and the jury declined to impose the death penalty and sentenced Appellant to life imprisonment. On December 13, 2002, the trial court sentenced Appellant on the remaining charges, resulting in an aggregate sentence of life imprisonment plus forty-three to eighty-six years of incarceration.

¶ 8 Appellant filed a timely post-sentence motion, and new counsel was appointed to represent him on the motion. On May 8, 2003, an evidentiary hearing was held with respect to Appellant's claim that he received ineffective assistance of trial counsel. Further argument on the matter took place on May 15, 2003, following which the trial court denied Appellant's post-sentence motion. The instant appeal followed. Appellant was not directed to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), and thus, did not file a 1925(b) statement. The trial court has not filed an opinion in this matter.

¶ 9 On appeal, Appellant argues that the trial court erred in denying his motion to suppress his statements to the police; that the trial court erred in failing to redact a portion of his statement to the police which indicated that he had committed robberies other than those with which he had been charged; that the trial court erred in allowing the Commonwealth to present testimony with regard to Appellant being interrogated by the police in an unrelated arrest; that the trial court erred in allowing the photo array shown to Dr. Levine to be published to the jury; that the trial court erred in denying Appellant's request that the jury be instructed that the arrest of the Appellant was not evidence of guilt; that the evidence was insufficient to sustain his conviction for murder in the first degree; and that Appellant received ineffective assistance of trial counsel.[8] For the reasons discussed below, we affirm.

¶ 10 Initially, we note that Appellant has failed include a separate averment that the trial court did not order a 1925(b) statement as required by Pa.R.A.P. 2111(d), but rather has buried that information within his Statement of the Case. Appellant has not set forth the text of the Order in Question as required by Pa.R.A.P. 2115(a). We also note that Appellant's Statement of the Questions Involved consists of well over fifteen lines and in other respects does not comply with the requirements of Pa.R.A.P. 2116. Appellant's Statement of the Case does not contain a chronological narrative of the underlying facts as required by Pa.R.A.P. 2117(a)(4), an omission we find particularly egregious given

---

8. We have reordered the issues in Appellant's brief.

that Appellant is challenging the sufficiency of the evidence. Lastly, Appellant's Summary of the Argument merely repeats his Statement of the Questions Involved which does not comply with the requirements of Pa.R.A.P. 2118.

■ ¶ 11 Appellant argues that the trial court erred in denying his motion to suppress his statements to the police because: (1) his oral statements to Officer Dawsonia were obtained in the absence of a *Miranda* [9] warning, were not obtained in the presence of counsel or an interested adult,[10] and while Appellant was laboring under the effects of a physical injury; (2) his oral and written statements to Detective Santamala were obtained in the absence of counsel or an interested adult and while Appellant was laboring under the effects of a physical injury; (3) his written statements to Detective Harris were obtained in the absence of counsel or an interested adult and while Appellant was laboring under the effects of a physical injury; and (4) his videotaped statement to Detective Rocks was obtained in the absence of counsel or the opportunity to consult with an interested adult and while Appellant was laboring under the effects of a physical injury.

In reviewing the denial of a motion to suppress, our responsibility is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. If the suppression court held for the prosecution, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the

suppression court are supported by the evidence, the appellate court may reverse if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177, 178–79 (1992) (citation omitted).

A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession.

*Commonwealth v. Jones*, 546 Pa. 161, 170, 683 A.2d 1181, 1189 (1996) (citations omitted). "The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his *Miranda* rights." *Commonwealth v. Bronshtein*, 547 Pa. 460, 464, 691 A.2d 907, 913 (1997) (citation omitted). Further, when determining the validity of a minor's confession, the Pennsylvania Supreme Court has stated:

All of the attending facts and circumstances must be considered and weighed in determining whether a juvenile's confession was knowingly and freely given. Among those factors are the juvenile's youth, experience, comprehension, and the presence of an interested adult.

*Commonwealth v. Williams*, 504 Pa. 511, 521, 475 A.2d 1283, 1288 (1984).

■ ¶ 12 Appellant argues that his various oral, written, and videotaped statements are not admissible because he was laboring under the effects of a physical

---

9. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. Appellant was two days shy of his eighteenth birthday at the time of his arrest.

injury. We find that this argument borders on the absurd. The uncontradicted evidence at the suppression hearing established that, during his struggles with the police, Appellant received a small cut on his forehead. N.T. 9/3/02 at 40, 67. Appellant was transported to Hahnemann Hospital where he was evaluated and released. N.T. 9/3/02 at 68. Appellant has presented nothing to establish that he had been given any medication at the hospital or that the small unbandaged cut on his forehead (one which is barely visible in the photographs taken of Appellant at the time of his arrest and in his videotaped statement) in any way incapacitated him or prevented him from making an informed waiver of his *Miranda* rights.

■ ¶ 13 Appellant claims that his statements to Officer Dawsonia should be suppressed because he was not *Mirandized* and no interested adult was present. It is well settled that volunteered or spontaneous utterances are admissible even though the declarant has not been *Mirandized*. *Commonwealth v. Baez*, 554 Pa. 66, 85–86, 720 A.2d 711, 720 (1998). Here, the uncontradicted testimony of Officer Dawsonia established that she and her partner were attempting to arrest Appellant who was struggling with them and reaching into his waistband. N.T. 9/03/02 at 67. Fearing for her safety, Officer Dawsonia directed her partner to move away from Appellant and said that she would have to shoot him. N.T. 9/03/02 at 67. Appellant then raised his hands and stated "I don't have a gun. I threw the gun. I'm not robbing anybody." N.T. 9/03/02 at 67.

¶ 14 It is clear from this testimony, that Appellant was not in custody at the time he made the statements and thus, no *Miranda* warnings were required. Officer Dawsonia did not ask Appellant any questions, and her remark that she would have to shoot Appellant because he would not stop struggling was not designed to elicit any verbal response or admission from Appellant. *Commonwealth v. Brantner*, 486 Pa. 518, 527, 406 A.2d 1011, 1016 (1979); *see also, Commonwealth v. Brown*, 551 Pa. 465, 482–83, 711 A.2d 444, 451–52 (1998) (volunteered statements are not subject to suppression for lack of a *Miranda* warning); *Commonwealth v. Jones*, 546 Pa. 161, 175–77, 683 A.2d 1181, 1186–89 (1996) (admissions made by a defendant during a stand-off with police were not subject to suppression and statements made by defendant in response to an overheard conversation were not subject to suppression). Accordingly, we find that Appellant's statements to Officer Dawsonia were properly admitted as spontaneous utterances. *See Baez*, 554 Pa. at 85–86, 720 A.2d at 720.

■ ¶ 15 Appellant also claims that his oral and written statements to Detective Santamala and Detective Harris, as well as his videotaped statement to Detective Rocks, should have been suppressed because they were obtained in the absence of counsel or an interested adult. We disagree.

¶ 16 The uncontradicted evidence at the suppression hearing established that Appellant was two days shy of his eighteenth birthday at the time his arrest. N.T. 9/03/02 at 82. The evidence also demonstrated that Appellant had previous contact with the police on November 1, 1999, and had invoked his right to remain silent. N.T. 9/03/02 at 81, 165–69. Detective Santamala and other police officers made numerous attempts to contact Appellant's father but were unable to reach him because he was resting and would not answer the telephone.[11] N.T. 9/03/02 at 83–84. Ap-

---

11. Later that evening, Detective Santamala was dispatched to Appellant's residence and

pellant did not live with either of his parents but rather resided next door to his father's residence. N.T. 9/03/02 at 95–96.

¶ 17 With respect to the statements made to Detective Santamala, the testimony at the suppression hearing demonstrated that Detective Santamala read Appellant his rights, Appellant signed a *Miranda* waiver and never indicated any desire to either speak to an attorney or to not speak to the police. 9/03/02 at 85–86. Appellant did not appear to be under the influence of drugs or alcohol and appeared to understand what was being said to him. N.T. 9/03/02 at 86–87. When Detective Santamala decided to question Appellant about a set of robberies that had previously occurred in the same general area where Appellant was arrested, he read him his *Miranda* warnings for a second time and Appellant again signed a waiver. N.T. 9/03/02 at 90–92. There was no evidence that Appellant was ever threatened, tricked, or otherwise coerced into making the statements. N.T. 9/03/02 at 141.

¶ 18 With respect to the statements made to Detective Harris, who questioned Appellant about the murder of Mr. Reitz, the hearing testimony demonstrated that Detective Harris went into the interview room, introduced himself to Appellant, explained why he was there and why he believed that Appellant was the individual who killed Mr. Reitz. N.T. 9/03/02 at 141–43. At that point, without being asked any questions, Appellant stated that he shot Mr. Reitz. N.T. 9/03/02 at 142–43. Detective Harris informed Appellant of his *Miranda* warning and Appellant signed a waiver. N.T. 9/03/02 at 144–46. Appellant never stated that he wished to consult with

counsel or that he wished to remain silent. N.T. 9/03/02 at 145–46. After Appellant gave his statement, Detective Harris was informed that Appellant's father had arrived. N.T. 9/03/02 at 148. Detective Harris allowed Appellant's father to review the statement, afforded him an opportunity to consult privately with Appellant, and re-*Mirandized* Appellant. N.T. 9/03/02 at 148–49. Appellant and his father both signed the statement after which Appellant and his father were transported to Homicide so that Appellant could make a videotaped statement. N.T. 9/03/02 at 149–51. Prior to the taking of the videotaped statement, Appellant was again given the opportunity to consult with his father in private. N.T. 9/03/02 at 182–83. There was no evidence that Appellant was ever threatened, tricked, or coerced at any time.

¶ 19 Based upon the above, we find that Appellant's statements were properly admitted. Appellant was nearly eighteen at the time of the statements; he did not live in his parents' residence; he had previous experience with the justice system; and, less than two months prior to the statements at issue, he invoked his right to remain silent. Appellant has presented nothing which would demonstrate that he did not understand his rights (which were read to him four different times), or that he was in any way threatened, tricked, coerced, or intimidated by the police.

¶ 20 Appellant also claims that the videotaped statement was not properly admitted because he was denied the right to privately consult with his father. This claim is belied by the record. Both Detective Harris and Detective Rocks specifically testified that they each allowed Appel-

---

was able to locate Appellant's father, Ronald Davis, who resided next door. N.T. 9/03/02 at 96–99. Appellant's mother was unavailable at that time. N.T. 9/03/02 at 109–111. Some

fifteen minutes after locating Appellant's father, Detective Sanatamala transported him to Central Detectives. N.T. 9/03/02 at 126–27.

lant to privately consult with his father prior to the taking of the videotaped statement. N.T. 9/03/02 at 149–51. To the extent that Appellant's father testified to the contrary, the trial court did not choose to credit his testimony and we are bound by that determination. Further, our review of the videotape shows that Appellant's father was present throughout the interview, including when Appellant was read his *Miranda* warnings for the fifth time, and never indicated that he wished to stop the videotaping or had any questions or concerns about the procedure. Accordingly, we find that the videotaped statement was properly admitted.

■■■ ¶ 21 Lastly, Appellant claims that the statements should not have been admitted because they were taken in violation of his right to a prompt arraignment because he was not arraigned within six hours of his arrest.[12] However, the Pennsylvania Supreme Court recently overruled the six-hour rule as enunciated in *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977) and *Commonwealth v. Duncan,* 514 Pa. 395, 525 A.2d 1177 (1987).

The purpose of the six-hour rule is to guard against coercive interrogation and to ensure the accused is promptly afforded his constitutional rights, *see Duncan,* at 1181; if the accused has not been subjected to coercive tactics, the mere passage of six hours in custody prior to questioning does not taint his confession. We agree that "[a]n involuntary confession can be extorted in five minutes or six hours. Time is important but not of the essence. It must be considered with other factors, but is not by mere passage determinative." [*Commonwealth v.*] *Hughes,* [521 Pa. 423, 555 A.2d 1264 (1989) ] at 1284 (McDermott, J., concurring). Accordingly, we hold voluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned are no longer inadmissible *per se.* [ ] Rather, in determining the admissibility of all statements, regardless of the time of their making, courts must consider totality of the circumstances surrounding the confession.... Hence, we do not return to the day of near-mandatory litigation based on delay alone, and hold that the time that elapses between arrest and arraignment, by itself, is not grounds for suppression.... This rule will apply to appellant's case and all pending cases where the issue has been properly raised.

*Commonwealth v. Perez,* 577 Pa. 360, 372–74, 845 A.2d 779, 786–88 (2004). Thus, to the extent that Appellant claims that his statements are *per se* inadmissible, that

---

12. Appellant was arrested on the charges arising from the incident on Delancey Street at some point between 11:30 p.m. on December 23, 1999, and 12:00 a.m. on December 24, 1999. N.T. 9/03/02 at 31–41. Following his arrest, he was transported to the hospital, where he remained for one-two hours. N.T. 9/03/02 at 31–41. He was then transported to Central Detectives. N.T. 9/03/02 at 41. Detective Santamala began questioning Appellant about the Delancey Street incident between 1:00 a.m. and 2:00 a.m. N.T. 9/03/02 at 78–79. At approximately 2:30 a.m., Appellant was arrested on the charges concerning the earlier Center City robberies. N.T. 9/03/02 at 85–91. Appellant completed his statement at approximately 4:00 a.m. N.T. 9/03/02 at 91. Detective Harris arrested Appellant on the charges arising out of the murder of Robert Reitz at approximately 6:00 a.m. on December 24, 1999. N.T. 9/03/02 at 141–47. Appellant completed his written statement regarding the murder and his consultation with his Father at approximately 7:30 a.m. N.T. 9/03/02 at 149–51. Appellant signed the consent to the videotape at approximately 8:55 a.m. and the videotaped interview began at approximately 9:58 a.m. and concluded at approximately 10:17 a.m. N.T. 9/03/02 at 178; 12/24/99 Videotape M99–284. Appellant was arraigned on December 25, 1999 at 3:40 a.m. N.T. 9/03/02 at 197.

claim must fail based upon the Pennsylvania Supreme Court's holding in *Perez*. Further, as discussed in greater detail above, Appellant has provided nothing which demonstrates that his statements were anything but voluntary. We have carefully scrutinized the timeline in the instant matter and find nothing which shows that the delays were caused or exacerbated by coercive police conduct. *See Perez*, at 788. Rather, it appears that the delays were caused by the treatment of Appellant's facial cut, the initial attempts to locate his father prior to questioning, the fact that Appellant was questioned about several different incidents, the involvement of detectives from two different divisions, the need to transport Appellant to different police stations, the time allowed for Appellant to consult privately with his father, and that the questioning took place on Christmas Eve. Accordingly, we find that the delay between Appellant's arrest and his arraignment did not render the statements involuntary and thus, the statements were properly admitted by the trial court.

¶ 22 Appellant next claims that the trial court erred in failing to redact a portion of his statement to the police which indicated that he had committed robberies other than those with which he had been charged. Firstly, we note that this claim is a misstatement of the record as the statement was partially redacted. N.T. 9/10/02 at 158–59; 9/11/02 at 56. In any event, we find the claim to be waived because defense counsel agreed to the admission of the partially redacted statement. N.T. 9/11/02 at 56.

¶ 23 Appellant claims that the trial court erred in allowing the Commonwealth to present testimony with regard to Appellant being interrogated by the police in an unrelated arrest. At trial, Appellant attempted to discredit his confessions to the police by claiming that the statements were involuntary. N.T. 9/9/02 at 138–30; 9/13/02 at 12–24. To rebut this argument, the Commonwealth introduced evidence that Appellant had a previous contact with the police, had invoked his right to remain silent, and that the invocation had been honored by the police. N.T. 9/11/03 at 162–69. No mention was made of the reason for the contact or of any criminal activities by Appellant. During jury instructions, the trial court gave a cautionary instruction concerning this evidence. N.T. 9/13/02 at 97.

> While evidence of other crimes is not admissible to prove criminal character or propensity to commit crime, it may be admissible for other purposes. Evidence of a distinct crime is admissible if offered to prove, *inter alia*, motive, intent, or the identity of the person charged with the commission of the crime being tried. Evidence introduced for this purpose is admissible if its probative value tends to outweigh its prejudicial value. We are mindful throughout this analysis of the presumption in our law that the jury follows the trial court's instructions. . . . Thus, we find that appellant suffered no prejudice as a result of the challenged testimony.

*Commonwealth v. Baez*, 554 Pa. 66, 87–90, 720 A.2d 711, 721–22 (1998). Here, no mention was made of any specific or distinct crime, but only that Appellant had a previous contact with the police, was read the *Miranda* warnings during that contact, invoked his right to remain silent, and that the police honored that right. N.T. 9/11/03 at 162–69. This evidence was properly offered to rebut Appellant's claims that, as a juvenile, he was too frightened by the police to invoke his rights, did not understand his rights, and when he did attempt to invoke his rights, was threatened and coerced by the police. *See Perez*, 577 Pa.

at 373, 845 A.2d at 787 (prior contact with the police is a factor in determining the voluntariness of a statement); *Commonwealth v. Hughes,* 521 Pa. 423, 444, 555 A.2d 1264, 1274–75 (1989) (juvenile's prior experience in invoking the right to remain silent suggests that a current waiver is knowing and voluntary); *Commonwealth v. Hernandez,* 498 Pa. 405, 412–13 n. 6, 446 A.2d 1268, 1272 n. 6 (1982) (juvenile's previous exercise of his right to remain silent was relevant in determining the voluntariness of the current confession). Further, the trial court appropriately cautioned the jury regarding the use of this evidence and jurors are presumed to follow instructions. *See Baez,* 554 Pa. at 87–90, 720 A.2d at 721–22. Appellant has offered nothing to show that he was prejudiced by the admission of relevant evidence. Accordingly, his claim must fail.

■ ¶ 24 Appellant claims that the trial court erred in allowing the photo array shown to Dr. Levine to be published to the jury because it implied that Appellant had committed prior criminal offenses. We disagree.

¶ 25 The photo array was offered to the jury after Appellant challenged the reliability of Dr. Levine's Identification testimony. N.T. 9/13/02 at 28–30. Here, with respect to the photo array, Detective Santamala testified that on January 4, 2000 (some twelve days *after* Appellant's arrest on most the charges in the instant matter), he prepared a photo array to show to Dr. Levine because of the similarities between the incident wherein he was robbed and the other robberies charged to Appellant. N.T. 9/11/02 at 113–115. Detective Santamala had previously testified that color photographs of Appellant had been taken upon his arrest. N.T. 9/11/02 at 112. Detective Santamala then testified that he prepared a photo array to show Dr. Levine and that the array consisted of ten black and white photographs. N.T. 9/11/02 at 113–15. There were no references made to "mug shots" or to how the photograph came into his possession.

¶ 26 In *Commonwealth v. Allen,* 448 Pa. 177, 292 A.2d 373 (1972), the Pennsylvania Supreme Court held that not every reference to a photographic identification of the accused is *per se* prejudicial. *Allen,* at 181, 292 A.2d at 375. The *Allen* court stated that "a mere passing reference to photographs from which a reasonable inference of prior criminal activity cannot properly be drawn does not invalidate the proceedings." *Id.* In *Commonwealth v. Brown,* 511 Pa. 155, 161, 512 A.2d 596, 599 (1986) (plurality), the Pennsylvania Supreme Court noted:

> ... the possession by the police of one's photo does not ineluctably prove a previous *conviction.* At most it proves only that the police had a photograph of the defendant on file.
>
> When an identification is made from police photo files, the photos become an integral and inseparable part of the evidence. When the initial identification is challenged at trial and their reliability and fairness put into question, they become evidence subject to examination by the jury.

*Brown,* at 161, 512 A.2d at 599 (emphasis in original). This Court has held that, absent testimony about how the photo became part of police files, a defendant is not prejudiced when a photo array is shown to a jury. *Commonwealth v. Lawrence,* 408 Pa.Super. 9, 596 A.2d 165, 170 (1991). More recently, in *Commonwealth v. Young,* 578 Pa. 71, 77, 849 A.2d 1152, 1156 (2004), the Pennsylvania Supreme Court reiterated that references to photographs or prior police contact does not constitute prejudicial error unless the references or statements imply prior criminal conduct. *Id.*

¶ 27 In the instant matter, there was nothing in the publication of the photo array which implied prior criminal conduct. Rather, based upon Detective Santamala's testimony and the fact that the photo array was prepared approximately twelve days after Appellant's arrest on the majority of the instant charges, it was reasonable for the jury to assume that the photo was taken following Appellant's arrest. Further, Appellant has not cited to any testimony in the record or to anything about the photographs themselves which implied prior criminal conduct. Accordingly, we find that Appellant's conclusory claim that the publication of the photo array to the jury prejudiced him to be meritless.

¶ 28 Appellant claims that the trial court erred in denying his request that the jury be instructed that the arrest of Appellant was not evidence of guilt. A trial court has broad discretion in phrasing its instructions to the jury and can choose its own wording so long as the law is clearly, adequately and accurately presented to the jury for consideration. *Commonwealth v. Hawkins*, 549 Pa. 352, 390, 701 A.2d 492, 511 (1997). Furthermore, a trial court need not accept counsel's wording for an instruction, as long as the instruction given correctly reflects the law. *Commonwealth v. Ohle*, 503 Pa. 566, 582, 470 A.2d 61, 70 (1983). In reviewing a challenged jury instruction, an appellate court must consider the entire charge as a whole, not merely isolated fragments, in order to ascertain whether the instruction fairly conveys the legal principles at issue. *Commonwealth v. Jones*, 546 Pa. 161, 192, 683 A.2d 1181, 1196 (1996). "[A jury] instruction will be upheld if it clearly, adequately and accurately reflects the law." *Commonwealth v. Brown*, 567 Pa. 272, 281 786 A.2d 961, 966 (2001).

¶ 29 Our review of the record demonstrates that the trial court committed no error in declining to give the requested charge. We have reviewed the remainder of the trial court's charge to the jury, particularly the sections on the presumption of innocence, N.T. 9/13/02 at 91, the burden of proof, N.T. 9/13/02 at 92, and reasonable doubt, N.T. 9/13/02 at 93, and deem it satisfactory. Since the trial court's charge clearly, adequately, and accurately reflected the law, the charge was proper.

¶ 30 Appellant argues that the evidence was insufficient to sustain his conviction for murder in the first degree because, as the murder took place during the course of a robbery, the Commonwealth failed to establish that Appellant acted with specific intent to kill. Our standard of review for sufficiency of the evidence claims is well settled:

> In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable [the factfinder] to find every element of the crime beyond a reasonable doubt. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty."

*Commonwealth v. Coon*, 695 A.2d 794, 797 (Pa.Super.1997) (citations omitted). Moreover, when reviewing the sufficiency of the evidence, this Court may not substitute its judgment for that of the fact-finder; if the record contains support for the convictions they may not be disturbed. *Common-*

*wealth v. Marks*, 704 A.2d 1095, 1098 (Pa.Super.1997) (*citing Commonwealth v. Mudrick*, 510 Pa. 305, 308, 507 A.2d 1212, 1213 (1986)). Lastly, a jury may believe all, some or none of a party's testimony. *Commonwealth v. Purcell*, 403 Pa.Super. 342, 589 A.2d 217, 221 (1991).

■ ¶ 31 The crime of murder is set forth in 18 Pa.C.S. § 2502, which states:

> (a) Murder in the first degree.—A criminal homicide constitutes murder in the first degree when it is committed by an intentional killing.
>
> (d) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection. "Intentional Killing." Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa.C.S. § 2502. Specific intent to kill may be inferred from the use of a deadly weapon upon a vital part of the body. *Commonwealth v. Hannibal*, 562 Pa. 132, 138, 753 A.2d 1265, 1268 (2000), *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2002, 149 L.Ed.2d 1004 (2001).

¶ 32 Here, Appellant essentially argues that, because the murder took place during the course of a robbery, the prosecution cannot establish specific intent to kill. Appellant has produced nothing to support the novel claim that a murder that takes place during the course of a robbery cannot be murder in the first degree. In any event, the evidence at a trial demonstrated that Mr. Reitz died as a result of being shot in the head. N.T. 9/11/02 at 140–142. Further, we have carefully reviewed Appellant's videotaped statement, in which Appellant stated that Mr. Reitz attempted to take Appellant's gun, Appellant hesitated, cocked the gun, raised the gun to chest level or above,[13] shot Mr. Reitz, hesitated again, then shot him a second time. Videotape M99–284, 12–24–99. Appellant then ran away without taking anything from Mr. Reitz. Videotape M99–284, 12–24–99. Further, the evidence demonstrated a progression of violence: Appellant threatened his first victim, Dr. Levine, with the gun; then, some five minutes later, deliberately shot Mr. Fritchman in the knee; the next day Appellant killed Mr. Reitz. N.T. 9/9/02 at 14–51; 9/10/02 at 9–20; N.T. 9/10/02 at 86–89. The evidence was plainly sufficient for the jury to decide that Appellant acted with specific intent to kill.

¶ 33 Lastly, Appellant claims that he received ineffective assistance of trial counsel because: (1) counsel failed to object to the trial court's removal of two jurors and the substitution of the two alternate jurors; (2) counsel failed to object to the Commonwealth's calling Appellant a liar during summation; and (3) counsel failed to request that the trial court instruct the jury that the identification testimony of Dr. Levine and Mr. Hoff be viewed with caution. Prior to the addressing the merits of Appellant's claim, we must first decide whether it is properly before us.

¶ 34 In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), the Pennsylvania Supreme Court stated that, "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Id.* at 67–68, 813 A.2d at 739. The Supreme Court noted that an exception to the general rule may be created when there has been a complete or constructive denial of counsel

---

**13.** On the videotape, Appellant gave two demonstrations of how he shot Mr. Reitz, in the first demonstration he aimed directly at the chest area, in the second at the head. *See* Videotape M99–284, 12–24–99.

or that counsel has breached his or her duty of loyalty. *Grant*, at 67, 813 A.2d at 738 n. 14. However, the appellate courts have carved out limited exceptions to the general rule set forth in *Grant*. Here, as the ineffective assistance of counsel claims was raised in a timely post-sentence motion, developed at a hearing, and ruled upon by the trial court, we find that an exception applies, and we will accordingly address the merits of Appellant's claim. *See Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003); *Commonwealth v. Hudson*, 820 A.2d 720 (Pa.Super.2003).

¶ 35 As Appellant's ineffective assistance of counsel claims were presented to and ruled upon by the trial court in a post-sentence motion, we review that court's denial of relief by determining if its findings are supported by the record and its order is free of legal error. *Commonwealth v. Kutnyak*, 781 A.2d 1259 (Pa.Super.2001). The legal standard applicable to ineffective assistance of counsel claims is well settled. To prevail on a claim that counsel was constitutionally ineffective, the appellant must overcome the presumption of competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different. A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *Commonwealth v. Wharton*, 571 Pa. 85, 98–99, 811 A.2d 978, 986 (2002) (citations omitted).[14]

¶ 36 Appellant first claims that trial counsel was ineffective for failing to object to the replacement of two sworn jurors. As discussed above, there was a change in the date the trial was to begin and the court was unable to contact one juror with respect to the change and the other juror had written to the court and said that he was unable to serve due to monetary considerations. N.T. 9/9/02 at 3–9. The jury had not been sworn and trial counsel agreed to a proposal that the two alternate jurors would serve as jurors and a new *voir dire* would be held to select two new alternate jurors.

¶ 37 We have reviewed Appellant's claim that trial counsel was ineffective for not objecting to this procedure and find it to be meritless. The record reflects that Appellant was actively involved in jury selection, N.T. 9/3/02 at 89; 9/4/02 at 88, and he has utterly failed to demonstrate that he was in any way prejudiced by the substitution of the alternates for one juror who could not be located and one juror who clearly was unwilling and financially unable to serve.

¶ 38 Appellant claims that counsel was ineffective for failing to object to the Commonwealth's calling Appellant a liar during summation. At trial, against the advice of counsel, N.T. 9/12/02 at 92–99, Appellant chose to testify on his own behalf. N.T. 9/12/02 at 103–37. While on the stand, Appellant testified to a version of the events that contradicted, in all respects, his prior statements to the police, the physical evidence, and the testimony of every single witness.[15] N.T. 9/12/02 at

---

14. The standard applicable to claims of ineffective assistance of counsel raised on direct appeal is the same as that applied to such claims raised under the PCRA. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 332 (1999).

15. Appellant's testimony included claims that, despite the absence of any visible injury on the photographs and videotaped statement taken at the time of his arrest, the police had run him over with a car, threw books at him, and beat him up; that the police had planted

103–37. During summation, the Commonwealth made several specific references to portions of Appellant's testimony as "the big lie," and "the ultimate lie." [16] N.T. 9/13/02 at 64, 67, 68.

¶ 39 At the hearing on Appellant's post-trial motion, trial counsel testified that he did not object to the Commonwealth's statements because he believed that his objection would be unsuccessful as the Commonwealth's comments were supported by the evidence; that making such an objection would only highlight the problems with Appellant's testimony; and, when the trial court overruled the objection, would make it appear as though the trial court also believed that Appellant was lying. N.T. 5/8/03 at 17–18. We find Appellant has failed to show that this claim has any arguable merit and has failed to show that trial counsel's failure to object was not a reasonable strategic decision.

■ ¶ 40 While it is well settled that it is improper for a prosecutor to express a personal opinion as to a defendant's guilt or credibility, a prosecutor is allowed to respond to defense arguments and present the case with force and vigor. *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d

225, 240–41 (1999) (citations omitted). Further, the Pennsylvania Supreme Court has held that "a prosecutor's comments stating that a defendant had lied were neither unfair nor prejudicial when given in response to the comments of defense counsel in relation to the credibility of witnesses, and when they were supported by the evidence." *Id.* Our review of the record demonstrates that the Commonwealth's statements were both proper as a response to Appellant's claim in summation that his testimony was consistent with other evidence offered in the case, N.T. 9/13/02 at 5–41, and were supported by the record. Further, given the nature of Appellant's testimony, it was certainly reasonable for counsel to not make a meritless objection that would have only highlighted the problems with Appellant's testimony.

■ ¶ 41 Lastly, Appellant claims that counsel was ineffective for failing to request the trial court instruct the jury that the identification testimony of Dr. Levine [17] and Mr. Hoff [18] be viewed with caution. As an initial matter, we note that Appellant did request, and received,[19] an

the gun seized at the time of his arrest; that the police threatened to kill him; that the police wrote out a script for his videotaped statement and his written statements; that the police tricked him; and that his three-year-old daughter, who was present throughout the trial, might not be his daughter. N.T. 9/12/02 at 103–37.

16. We note that the Commonwealth never directly said that Appellant was a liar or that he had lied.

17. Dr. Levine vacillated between Appellant and another individual at the lineup and ultimately chose the wrong individual, but testified that, when he left the lineup, he believed that he had chosen the wrong person and should have chosen Appellant. N.T. 9/9/02 at 160–61. Dr. Levine positively identified Ap-

pellant in the photo array, at the preliminary hearing, and at trial.

18. Mr. Hoff never failed to identify Appellant and, in fact, identified him at the lineup, the preliminary hearing, and at trial. However, Mr. Hoff testified that he could not be "positive" when he identified Appellant at the lineup. N.T. 9/12/02 at 41.

19. The trial court instructed the jury:

In this case there was testimony from witnesses identifying this defendant as the person who committed the crime. Where there is a question regarding the identification and its accuracy the law states that a victim or witness can sometimes make a mistake when trying to identify a criminal. If certain factors are present, ladies and gentlemen, the accuracy and identification

identification testimony cautionary instruction pursuant to *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954). Thus, Appellant's claim is not that counsel did not ask for a cautionary instruction, but rather that he did not request that the trial court instruct that, as a matter of law, there had been misidentifications by Dr. Levine and Mr. Hoff. N.T. 5/8/03 at 24.

¶ 42 At the hearing on Appellant's post-trial motion, trial counsel stated that he believed that the instruction given by the trial court was more appropriate, because telling the jury that they must view the identifications with caution as a matter of law would have only highlighted the positive identifications made by other prosecution witnesses. N.T. 5/8/03 at 24–25. We find nothing inappropriate or ineffective about trial counsel's decision.

¶ 43 Firstly, there was simply nothing in the record which would have supported an instruction that Mr. Hoff's identification testimony should be viewed with caution as a matter of law. Mr. Hoff never misidentified Appellant. As most, Mr. Hoff stated that he was not "positive" at the lineup. The fact that Mr. Hoff did not positively identify Appellant at the lineup is not sufficient to warrant a cautionary instruction that his identification testimony should be viewed with caution as a matter of law. *Commonwealth v. Yarris*, 519 Pa. 571, 600, 549 A.2d 513, 527–28 (1988) (no cautionary instruction with respect to identification

was necessary where witness testified that they were not positive in their identification during pre-trial procedures but had never failed to identify the defendant). Secondly, with respect to Dr. Levine, while there was a prior failure to identify, given Dr. Levine's testimony with respect to the lineup, his prior identification of Appellant in a photo array, and his subsequent identifications of Appellant at the preliminary hearing and at trial, as well as the positive identifications of Appellant by other witnesses, it was a reasonable strategic decision for counsel to just request a general *Kloiber* instruction rather than an instruction which would have highlighted the other positive identifications of Appellant.

¶ 44 Judgment of sentence affirmed.

---

testimony is so doubtful that a jury must receive it with caution. Identification testimony must be received with caution if the witness because of bad position, poor lighting or other reasons did not have a good opportunity to observe the criminal.

If the witness in his testimony is not positive to identify, if the witness's prior testimony has been weakened by qualification, hedging, or inconsistency in the rest of his testimony by not identifying the defendant or identifying someone else as the criminal at a lineup or when shown photographs, if you believe that one or more of these factors were present during the identification by either one or more of the victims, then you must consider with caution the testimony of these particular witnesses identifying the defendant as the person who committed the crime. If, however, you do not believe that at least one of these factors is present, you need not receive the testimony with caution. You may treat it like ordinary testimony and a statement of fact.

N.T. 9/13/02 at 113–14.