J-S50025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JOHN EDWARD CHAIRMONTE | : | |
| | : | |
| Appellant | : | No. 2815 EDA 2015 |

Appeal from the Judgment of Sentence August 13, 2015
In the Court of Common Pleas of Bucks County Criminal Division at No(s):
CP-09-CR-0003833-2014

BEFORE:   PANELLA, J., RANSOM, J., and PLATT*, J.

MEMORANDUM BY RANSOM, J.:                **FILED FEBRUARY 27, 2018**

Appellant, John Edward Chairmonte, appeals from the judgment of sentence entered August 13, 2015, after a jury convicted him of arson endangering persons, arson endangering property, and insurance fraud.[1] We affirm.

The relevant facts of this case are as follows.  At about 8:25 a.m., on February 10, 2014, two employees at a Bank of America branch in Bensalem Township observed Appellant in the branch's parking lot, where "a whole bunch" of papers flew out of his automobile; he did not retrieve them.  The employees saw Appellant leave "in a rush" after they noticed a fire truck pass by and heard sirens.

_____

[1] 18 Pa.C.S. §§ 3301(a)(1)(i), 3301(c)(3), and 4117(a)(2), respectively.


*   Retired Senior Judge assigned to the Superior Court.

At approximately 8:30 a.m., police and firefighters responded to a report of a fire at Appellant's home in Bensalem. After the fire was extinguished, Battalion Chief Robert Sponheimer[2] of the Bensalem Fire and Rescue Department "began the investigation into its cause using a systematic approach, starting his investigation at the areas of least damage and progressing towards the more serious damage." Trial Court Opinion (TCO), 12/12/16, at 21. He "determined that the area of origin of the fire was located in the kitchen on a countertop on the southwest wall." *Id.*

Detective Stephen Clark of the Bensalem Township Police Department was assigned to investigate the fire at Appellant's house. At Detective Clark's request, Appellant came to the police station to be interviewed at around 9:55 a.m. "Appellant related that when he returned home and saw the fire he initially thought it was his neighbor's house. When asked about appliances, he responded that the only appliance that had been on was the coffee maker." TCO at 18. "After the interview, Appellant left the station on his own at around 10:35 a.m." *Id.*

> [Continuing his investigation,] Chief Sponheimer conducted an inspection of the electrical system which revealed the main breaker to the house was still on but about ten breakers in the service panel were in the tripped position, which is what he expected to see. His investigation of the electrical wiring and

_____

[2] Chief Sponheimer was accepted as an expert in fire investigation at trial without objection from defense counsel as to his credentials.

receptacles in the kitchen revealed no arcing,[3] high-resistance heating or other failures. He determined, from Appellant's statements and his own observation, that a mixer had not been plugged in and could not be the cause of the heat source for the fire. He identified an electric cord from the coffee maker that was still plugged into an outlet, and a microwave that was located next to the coffee maker. The microwave had been attacked by fire and had protected the countertop underneath, so Chief Sponheimer concluded the microwave was not the cause of the fire. Chief Sponheimer pried the coffee maker off of the countertop and observed that the plastic at the bottom with the heating element was still intact.

. . . [S]heetrock that had been pulled down by the fire personnel but did not burn through provided a timeline for the fire[, which] helped [Chief Sponheimer] determine how long it actually burned. . . . [T]he exhaust fan over the stove had dropped down onto the stove during the fire[,] and . . . the burn patterns showed the fire progressed towards the ductwork seeking air. . . . [T]he gas range stove showed some charring but the four knobs were all intact and not melted and were turned in the off position. Chief Sponheimer also interviewed the fire fighters who stated they did not turn the knobs off and they did not smell any gas. Chief Sponheimer . . . located a toaster that was still plugged in another area of the countertop area that had not been damaged as much as the area of origin, and as a result, the bottom of the toaster and some of its plastic pieces were still intact. He also inspected a dishwasher located under the counter which exhibited no signs of fire damage. . . .

Chief Sponheimer also interviewed Appellant who stated to him that at the time of the fire he had been gone for about fifteen to thirty minutes attempting unsuccessfully to make a deposit at the Bank of America located approximately a mile and a half from his residence. Appellant stated that after he woke up he smoked a cigarette and decided to go to the bank but first turned on the coffee maker to make a pot of coffee. . . .

_____

[3] Chief Sponheimer explained that "arcing" is evidence that a device, such as the coffeepot, "was plugged in, it had electric going to it, and there was a failure or high heat." Notes of Testimony (N.T.), 1/28/15, at 152.

Based upon Appellant's statements that he had been smoking, Chief Sponheimer investigated the possibility that cigarettes had been involved in creating the fire, but he only found evidence of cigarettes in the living room. He [later testified] that when a cigarette ignites a fire it creates a smoldering type of fire that would take a longer period of time to create a flame, and this was not consistent with what he observed in this case. . . .

TCO at 22-23 (citations omitted).

Almost three years prior to the arson at issue, on March 19, 2011, at about 4:30 a.m., a fire had occurred at Appellant's residence. For that fire, Appellant had stated that, after smoking a cigarette, he had fallen asleep on the sofa in the living room when his dog woke him, and he discovered smoke throughout the house. Chief Sponheimer had also responded to that fire and opined that it was incendiary – *i.e.*, intentionally set -- and that an open flame, such as a match or lighter was used to ignite available combustibles located within a trash can.

Chief Sponheimer later learned from talking to Appellant that there had actually been yet another fire at Appellant's house on March 17, 2011. No fire companies had been alerted about that incident, and no official investigation was conducted.

[In Chief Sponheimer's opinion,] the subject February 10, 2014 fire was incendiary and . . . an open flame had been used to ignite ordinary available combustible materials, otherwise known as "first fuel," located on the countertop.[4] . . . [Throughout his

---

[4] During trial, Chief Sponheimer explained that "first fuels" typically ignite, turn to ash, and disappear, and that, as noted in [National Fire Protection Association ("NFPA") Code] section 19.3.1.1, they often do not survive the fire. TCO at 25 (citations omitted).

investigation, Chief Sponheimer] used a systematic approach to eliminate other potential sources of the fire, such as the dishwasher, electric stove, gas range, mixer, and microwave, that was based upon his observations of the damage and condition of the residence and various items as well as interviews of the personnel involved. . . . [Chief Sponheimer] reevaluated the coffee maker and could not rule that out as a source of ignition, so he contacted the Bureau of Alcohol, Tobacco, Firearms and Explosives, or ATF, and a special agent came and x-rayed it at the police station. He was later advised by an agent who reviewed the x-rays and performed a physical examination that there were no signs of failure within the coffee maker.

TCO at 25-26 (citations omitted).

After obtaining search warrants, Detective Clark . . . obtained Appellant's financial records from various banks, including Univest, TD Bank, Wells Fargo and Bank of America, and the Parx Casino. In addition, Detective Clark obtained "a lot of his banking information from the paperwork that [Appellant] threw [and left] in the parking lot" of the Bank of America on the morning of the fire. An analysis of these records revealed *inter alia* . . . a large number of ATM withdrawals during the month of, and prior to, the February 10, 2014 fire, including withdrawals in February of $1,000 and $2,139.90 from the casino. . . . [W]ithdrawals from the casino are achieved through the use of a "Players Card" which is issued to casino customers for earning "comps" for food, merchandise and money.

*Id.* at 19 (citation omitted).

[Arthur] Czajkowski was assigned to investigate the fire at Appellant's house for Allstate Insurance Company[ ("Allstate").[5]] . . . Based upon the results of his investigation, Mr. Czajkowski eliminated the appliances as well as the recept[a]cles as the point of origin and noted that only the toaster and coffee maker had been plugged in. He determined that the point of origin and

---

[5] Mr. Czajkowski was accepted by the trial court as an expert witness without objection from defense counsel as to his credentials. TCO at 26.

deepest burn pattern was located about 6 inches in on the countertop. He explained [during trial] that fire burns up and out, and the burn patterns revealed that after the fire started it attacked the plastic coffee pot, the George Foreman grill on top of the microwave and then the cabinets. Mr. Czajkowski concluded that the timing of the fire was less than 45 minutes because "it didn't compromise the drywall in the kitchen."

. . . Appellant's property had been insured for $179,553 and the contents for $107,732. . . . Appellant had submitted claims from the two prior fires on March 17 and 19, 2011, for which the insurance company paid approximately $3,000 for the first claim and $66,000 for second claim. . . . [T]he Allstate Insurance estimate for damages to the residence resulting from the February 10, 2014 fire was $88,885.36, of which $13,729.20 would be deducted for depreciation, and therefore a check for approximately $75,156.16 would have been issued. That amount, however, would have been subject to possible modification and did not include the value of the contents.

. . . Allstate did not pay out on the claim [in 2014] because Appellant did not cooperate with their investigation. . . .

Michael Keller is a senior electrical engineer for the fire research laboratory run by [ATF,] who was accepted by the [trial c]ourt as an expert in the field of electrical engineering aspects of fire investigation and forensic examination of appliances. After Mr. Keller had been contacted by special agent Jerry Petrovitch around February 2014, Mr. Keller suggested that he x-ray the coffee maker that was under investigation. Mr. Keller's subsequent analysis of the x-rays revealed that the "thermo protection" built into the coffee maker had operated correctly and it was therefore "highly unlikely that [the coffee maker] had anything to do with causing the fire."

Mr. Keller was sent the coffee maker and an electric can opener in June of 2014. [Later, during trial, h]e described the operating principles of coffee makers, and the thermal protection and cut-out devices that are incorporated for safety, and explained that all three of the thermal protection devices in the coffee maker would have had to fail in order for the unit to go into a "thermal runaway" condition in which it got hot enough to be the source of ignition for the fire. He stated that the bottom of the coffee maker was in "pretty good shape," however, and explained that the internal components including the circuit board and rubber

- 6 -

tubes were intact, from which he concluded that the coffee maker heater had not failed and ignited the unit. His analysis also revealed that two of the thermal protection devices had operated properly. He concluded that the heat that caused the unit to melt was applied from the outside and not from the inside of the unit. Mr. Keller's analysis of the can opener did not reveal anything remarkable, and he concluded that the heat had "impinged" upon it from outside. . . .

Timothy Wilhelm, a certified fire investigator. . . [,] was retained by the defense and accepted by the [trial c]ourt as an expert in the field of fire investigation. . . . [B]ased upon results of the testing by the ATF, he did not believe the coffee maker or microwave caused of the fire, and he believed the cause of the fire was undetermined. He later acknowledged that he did not interview his client or any of the people who responded to the fire, nor did he write a report of his analysis for his client as he usually does.

TCO at 26-29, 31 (citations omitted). Appellant was arrested on June 12, 2014.

Prior to the commencement of trial, the Commonwealth filed a motion *in limine* to admit evidence of Appellant's "prior bad acts" – specifically, evidence of two fires at Appellant's residence in March 2011. TCO at 5. "Defense counsel contested the admissibility of that evidence and a hearing followed." **Id.**

[During the pretrial "prior bad acts" hearing,] Chief Sponheimer . . . testified that he conducted a fire investigation at Appellant's . . . residence . . . after a fire occurred there at 4:33 a.m. on March 19, 2011. The damage resulting from that fire was limited to the kitchen area but the remainder of the house did suffer smoke damage. Chief Sponheimer determined that the fire originated in a trash can under the cabinets. He observed that there was no electricity in that area, and that in fact the house had no electric service because the electric meter had been previously disconnected as a result of another fire that had occurred at the residence two days earlier on March 17, 2011.

Chief Sponheimer noted that none of the local fire companies had been notified of that fire.

Chief Sponheimer determined that the point of origin of the fire had been in a covered plastic trash can inside a cabinet which evidenced a common V burn pattern. He did not find a source of ignition, such as discarded cigarettes or burned candles, but found only cans and "ordinary" Class A fast burning combustibles in the trash.[6] He characterized the fire as quick-moving and localized, and stated that it was not a smoldering type of fire.

After investigating the fire, Chief Sponheimer questioned Appellant who related that he smoked cigarettes and had been using candles in the house because the power supply had been disconnected to the residence as a result of the previous fire that occurred on March 17, 2011. In fact Appellant stated that he had requested the electric utility remove his meter a day or two before. Appellant stated that he had been sleeping on a couch in the living room which was located on the other side of the drywall where the fire originated. Chief Sponheimer observed that Appellant was fully dressed and did not appear like he just woke up, and displayed "no signs of smoke or soot on his person." When Appellant was advised of the point of origin of the fire, he suggested that perhaps his mother had thrown a candle or dumped an ashtray into the trash.

Based upon his investigation and interviews of other fire personnel on the scene as well as a process of elimination, Chief Sponheimer concluded that "the fire was incendiary in nature," and that "an open flame was applied to available combustibles within the trash can." . . .

At the conclusion of the hearing, th[e trial c]ourt . . . granted the Commonwealth's motion[.]

TCO at 5-7 (citations omitted).

---

[6] Chief Sponheimer defined a "Class A material" as "wood, paper, plastic, if it is ignited, it will burn, it will turn to ash, and it will not be there." N.T., 1/28/15, at 154.

Next, "defense counsel presented a motion to suppress statements made by Appellant." TCO at 10 (citations omitted). During the suppression hearing, Detective Clark testified that he had interviewed Appellant twice: first on February 10, 2014; then, on February 12, 2014.

Detective Clark stated that, for the first interview on February 10, 2014, Appellant "came of his own free will, drove himself there, and after the interview he was allowed to leave and he did leave." Notes of Testimony (N.T.), 1/28/15, at 75; *see also id.* at 81 (Appellant "left the police station on his own"), *id.* at 83 (Appellant "got in his vehicle and followed" Detective Clark "to [the] station"). Detective Clark acknowledged that, prior to the interview, he had not read Appellant's *Miranda* rights to him, because he "was not . . . being interrogated." *Id.* at 88. Detective Clark testified that, "[a]t the time, we were trying to gather information about the fire. It wasn't an interrogation. [Appellant] wasn't being charged at that time, it was just an investigation." *Id.* at 89.

Detective Clark continued that, for the second interview on February 12, 2014, "shortly after 11 a.m.," he arrived at the Extended Stay America Hotel in Bensalem to deliver a property receipt to Appellant for items that were recently seized from Appellant's home after a search warrant had been executed on the residence. N.T., 1/28/15, at 73. According to Detective Clark, he was there "to drop off" the paperwork for Appellant – "If I didn't find him, I wouldn't have had a conversation with him," and, instead, "would have had [the paperwork] posted on the mailbox

or in the house." *Id.* at 96-97. "When [Detective Clark] encountered Appellant in the parking lot leaving the hotel," TCO at 10, Appellant "was seated in his vehicle." N.T., 1/28/15, at 76. When Appellant saw Detective Clark, he "rolled his window down[.]" *Id.* "Detective Clark questioned [Appellant] in order to clarify some responses he had provided to the police during an interview at the police station two days earlier right after the fire on February 10, 2014." TCO at 10 (citing N.T., 1/28/15, at 72-77). Detective Clark further testified that Appellant never indicated that he did not wish to speak with the detective. According to Detective Clark, Appellant also never requested to speak with an attorney.

> At the conclusion of testimony, defense counsel argued that all statements made by Appellant during his February 12, 2014 encounter with Detective Clark should be suppressed because he was allegedly represented by counsel at the time. Th[e trial c]ourt rejected that argument and denied the motion to suppress, placing [its] reasons of record in part as follows:
>
>> [Appellant] was not in custody. There was an investigation that was ongoing. There was nothing that was stated on this record to indicate that [Appellant] was even a target of the investigation, let alone a person whose freedom was restricted.
>>
>> The officer was not restricted in pursuing his investigation under the circumstances and, therefore, the motion to suppress is denied.
>
> A *Frye* hearing was then conducted on the defense motion to preclude the Commonwealth's expert witnesses, [Chief Sponheimer and Mr. Czajkowski,] on the basis that they used an incorrect methodology to determine the cause of the fire, and that as a result the cause of the fire should have been determined to be undetermined and not incendiary.

TCO at 11 (citations omitted); *see also* N.T., 1/28/15, at 111-12 (Defense counsel argued that the methodology, "commonly referred to as negative corpus," or the lack of specific evidence, was "not approved by the [National Fire Protection Association ("NFPA") Code] 921").

During the *Frye* hearing, Appellant asked Chief Sponheimer to define "negative corpus," and the witness explained: "NFPA 921 has negative corpus within it. It is to say that you can't just come up with a cause [for a fire,] because you feel it's that way, that there's no other reason and so it has to be this." N.T., 1/28/15, at 137. Chief Sponheimer agreed with Appellant that "[n]egative corpus is a term frowned upon in the community of doing fire investigations[.]" *Id.* at 137-38. Chief Sponheimer's *Frye* hearing testimony continued:

> Q. ["Negative corpus"] indicates that the process of elimination is an integral part of the scientific method; is that right?
>
> A. Yes.
>
> Q. Alternative hypotheses should be considered and challenged against the facts; is that right?
>
> A. That is what it says.
>
> Q. Elimination of a testable hypothesis by disproving a hypothesis with reliable evidence is a fundamental part of the scientific method.
>
> Am I reading that correctly?
>
> A. Yes.
>
> Q. However, the process of elimination can be used inappropriately, right? The process of determining the ignition source for fire by eliminating all ignition sources found, known,

or believed to have been present in the area of origin and then claiming such methodology is proof of an ignition source for which there is no supporting evidence of its existence is referred to by some investigators as negative corpus.

Am I reading that properly?

A.    Yes, you are.

Q.    And negative corpus has typically been used in classifying fires as incendiary although this process has also been used to classify fires as accidental; is that correct?

A.    Yes.

Q.    This process is not consistent with the scientific method. It is inappropriate and should not be used because it generates untestable hypotheses.

Is that what it reads?

A. Yes.

*Id.* at 137-39.  Appellant then suggested to Chief Sponheimer that "what [he] did . . . was come up with a negative corpus," and Chief Sponheimer "disagree[d]." *Id.* at 140.  Chief Sponheimer explained that his method was not negative corpus, because he "didn't just go there and go there's nothing else here, it has to be this." *Id.* at 143.  He continued:  "[D]uring the scientific method and the systematic approach, you interview witnesses, you collect data[.]" *Id.* at 142.  "He noted that Appellant had placed himself at the scene of the fire within one half hour, but had reported no problems with any of the appliances, was not smoking or using candles, and had cleaned the area."  TCO at 12 (citations omitted).  Chief Sponheimer "tested other materials in and around the areas."  N.T., 1/28/15, at 145.  He "saw no signs" of accelerant but tested for it, anyway. *Id.* at 149.  As the trial court

summarized: "Chief Sponheimer testified that in investigating the subject fire, he had eliminated all accidental and natural causes, tested various hypotheses, and concluded that the fire was incendiary. The hypotheses included a faulty coffee maker and electrical outlet, and the possibility that the fire was incendiary in nature." TCO at 12 (citations omitted). "He therefore ruled out the possibility of an accidental fire, and stated that he concluded that the ignition source was an open flame of undetermined nature that ignited class A ordinary combustible materials." *Id.*

Chief Sponheimer also noted that the NFPA code does not state that "negative corpus" can never be used by investigators:

> First, it says some investigators; under the reading you have there, it says some investigators believe this is negative corpus, not all. I'll show you the line if you would like me to. . . . In the middle: some investigators, negative corpus (indicating) It does not say all investigators. . . .

> It's just an area that says, again, it's appropriate use for some investigators. This is a guide, and the guide says some investigators feel this or refer to this as negative corpus, not all[.]

N.T., 1/28/15, at 141-42.

The next witness at the *Frye* hearing was Mr. Czajkowski, who concluded that the 2014 fire began when an open flame had been intentionally applied to available combustibles. TCO at 12 (citations omitted).

> Mr. Czajkowski stated that NFPA 921 does not specifically exclude negative corpus as a potential avenue for fire investigation. He stated that NFPA 921 permits an investigator's knowledge and experience to eliminate negative corpus and it

allows for the hypothesizing of an ignition source, even if one is not present.

*Id.* at 13 (citations omitted). After argument, the trial court denied the motion to exclude the testimony of the Commonwealth's expert witnesses. *Id.*

In February 2015, following trial, the jury convicted Appellant of all charges. Prior to sentencing, in March 2015, Appellant filed a motion for extraordinary relief, seeking arrest of judgment or, in the alternative, a new trial, because "[t]he evidence was insufficient to sustain the verdict[.]" Mot. for Extraordinary Relief Pursuant to Pa.R.Crim.P. 704(b), 3/18/15, at 1. Later that month, the trial court denied this motion.

Following Appellant's sentencing in August 2015, Appellant's trial counsel filed a notice of appeal and a motion to withdraw, which the trial court granted in September 2015. The public defender was appointed to represent Appellant. However, shortly thereafter, Appellant privately retained new counsel for this appeal.

> On October 2, 2015, th[e trial c]ourt issued an Order directing Appellant to file a Pa.R.A.P. 1925(b) Concise Statement of the Errors Complained of on Appeal no later than twenty one (21) days from the date of the Order.
>
> On October 13, 2015, [Appellant's appellate counsel] filed a "Motion for Extension of Time to File 1925(b)," on the basis that the "trial transcripts were not yet complete" and he needed "additional time to meet with and consult with his client who is incarcerated[," which was granted.]

TCO at 3.

> On January 27, 2016, after concluding that Appellant's failure to submit a timely Statement of Errors had prevented th[e trial

- 14 -

c]ourt from adequately addressing the merits of the appeal, th[e trial c]ourt filed an Opinion suggesting that the issues had been waived and the appeal should be quashed.

On February 26, 2016, upon consideration of Appellant's "Motion to Remand for Submission of 1925(b) Statement," the Superior Court of Pennsylvania issued an Order remanding this matter to th[e trial c]ourt for a period of sixty (60) days and directing that "Appellant shall be permitted to file in the trial court and serve upon the trial judge a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, within twenty-one (21) days of the date that this Order is filed."

The Order further directed that the "Trial judge shall prepare a supplemental opinion, pursuant to Pa.R.A.P. 1925(a), in response to the Rule 1925(b) statement, within thirty (30) days of the date the statement is received."

*Id.* at 4. Appellant finally filed a statement of matters complained of on appeal, and the trial court issued a responsive opinion.

Appellant now presents five issues for our review:

A. Whether the verdict was against the weight of the evidence to convict [Appellant] of arson, arson with intent to commit insurance fraud and insurance fraud where there was no evidence that [Appellant] intentionally set his house on fire?

B. Whether the verdicts were insufficient as a matter of law to convict[ Appellant] of arson, arson with intent to commit insurance fraud and insurance fraud where the Commonwealth failed to prove intent?

C. Whether the trial court erred in granting the Commonwealth's motion to admit prior bad acts?

D. Whether the trial court erred in denying the defense motion to suppress statement?

E. Whether the trial court erred in denying the defense motion in limine to exclude testimony of expert witness?

Appellant's Brief at 5.

**Weight of the Evidence**

As a preliminary matter, generally, a challenge to the weight of the evidence must be preserved by a motion for a new trial.  Pa.R.Crim.P. 607.  The Rule provides:

> A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:
>
> (1) orally, on the record, at any time before sentencing;
>
> (2) by written motion at any time before sentencing; or
>
> (3) in a post-sentence motion.

Pa.R.Crim.P. 607(A)(1)-(3).  "As noted in the comment to Rule 607, the purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." ***Commonwealth v. Gillard***, 850 A.2d 1273, 1277 (Pa. Super. 2004).  A claim challenging the weight of the evidence generally cannot be raised for the first time in a Rule 1925(b) statement.  ***Commonwealth v. Burkett***, 830 A.2d 1034, 1037 (Pa. Super. 2003).  An appellant's failure to avail himself of any of the prescribed methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion.  ***Id.*** at n.3.

Instantly, Appellant failed to challenge the weight of the evidence before the trial court in a motion for a new trial.  While Appellant's motion for extraordinary relief pursuant to Pa.R.Crim.P. 704(b) "move[d] the [trial] court for a new trial," his basis for this request was that "[t]he evidence was insufficient to sustain the verdict[.]"  Mot. for Extraordinary Relief Pursuant

to Pa.R.Crim.P. 704(b), 3/18/15, at 1. Nowhere within his motion for extraordinary relief – nor anywhere else on the record before sentencing -- did Appellant challenge the weight of the evidence. He also did not file any post-sentence motions. Rather, Appellant raised his weight claim for the first time in his Rule 1925(b) statement. Thus, his first issue on appeal is waived. **See** Pa.R.Crim.P. 607; **Gillard**, 850 A.2d at 1277; **Burkett**, 830 A.2d at 1037.

## Sufficiency of the Evidence

Appellant claims that the Commonwealth failed to prove the elements of arson endangering persons, arson endangering property, and insurance fraud. Appellant contends that "the Commonwealth failed to prove intent." Appellant's Brief at 34.

A claim challenging the sufficiency of the evidence presents a question of law. **Commonwealth v. Sullivan**, 820 A.2d 795, 805 (Pa. Super. 2003) (citation omitted).

> Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. . . . When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

**Id.** (citation omitted). As a reviewing court, we may not weigh the evidence or substitute our judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. **Commonwealth v. Haughwout**, 837

A.2d 480, 484 (Pa. Super. 2003). "Furthermore, the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Lewis*, 911 A.2d 558, 563 (Pa. Super. 2006) (citation and internal brackets and quotation marks omitted).

> An intent is a subjective frame of mind, it is of necessity difficult of direct proof. We must look to all the evidence to establish intent, including, but not limited to, appellant's conduct as it appeared to his eyes. Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances.

*Id.* at 564 (citation and internal brackets omitted).

> Here, Appellant specifically argues:

> There is no evidence that the Appellant intentionally set fire to his house or intentionally attempted to collect insurance fraudulently. The Appellant indicated to several witnesses that he recalled that he had left the coffee pot on and at least one other appliance. There was not any evidence of accelerants that were used in the house. . . . The absence of evidence with regard to intent requires this [C]ourt [to] reverse the conviction.

Appellant's Brief at 36.

Appellant was convicted of two subsections of the arson statute, 18 Pa.C.S. § 3301. The first subsection, for the charge of arson endangering persons, states:

> A person commits a felony of the first degree if he **intentionally starts a fire** or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:

>> (i) he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a

firefighter, police officer or other person actively engaged in fighting the fire[.]

*Id.* § 3301(a)(1)(i) (emphasis added). The second subsection, for the charge of arson endangering property, states:

A person commits a felony of the second degree if he **intentionally starts a fire** or causes an explosion, whether on his own property or that of another, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, and if: . . .

he commits the act with intent of destroying or damaging any property, whether his own or of another, to collect insurance for such loss.

*Id.* § 3301(c)(3) (emphasis added).

Appellant was also convicted of insurance fraud pursuant to 18 Pa.C.S. § 4117(a)(2):

A person commits an offense if the person does any of the following: . . .

(2) **Knowingly and with the intent to defraud** any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

*Id.* (emphasis added).

As noted above, the Commonwealth may prove every element of these crimes – including intent – beyond a reasonable doubt by means of wholly circumstantial evidence. *Lewis*, 911 A.2d at 563. Here, while there was no direct evidence presented proving that Appellant "intentionally start[ed] a fire" in his residence, 18 Pa.C.S. § 3301(a)(1)(i), (c)(3), the jury heard ample circumstantial evidence, which we view "in the light most favorable"

to the Commonwealth as "the verdict winner." **Sullivan**, 820 A.2d at 805. This evidence included the testimony of the Commonwealth's fire investigation experts, Chief Sponheimer and Mr. Czajkowski, who ruled out all other possible, accidental explanations for the cause of the fire, including the coffee maker, discarded cigarettes, the dishwasher, the electric stove, the gas range, the microwave, the mixer, and the receptacles.[7] Additionally, the jury heard testimony from Mr. Keller, a senior electrical engineer with ATF, that the coffee maker, the kitchen electrical receptacle, and the gas range could not have been the source of the fire. Having eliminated other potential sources of the fire, Chief Sponheimer concluded that the fire was incendiary in nature and that an open flame had been applied to available combustibles.

Appellant's bank transactions and records were also presented to the jury, from which it could reasonably infer his financial uncertainty and hence his motive for intentionally setting a fire in his residence in order to collect the insurance proceeds. **See Sullivan**, 820 A.2d at 805. Appellant's intent to set the fire and to collect an insurance payment fraudulently was further supported by evidence of two fires of a similarly suspicious nature that occurred at Appellant's residence on March 17 and 19, 2011, after which he

---

[7] Appellant's own expert witness, Mr. Wilhelm, agreed that neither the coffee maker nor the microwave were the cause of the fire.

had collected insurance payments of approximately $3,000 for the first claim and $66,000 for the second claim.[8]

"[L]ooking to all [of] the evidence," the jurors "inferred from [Appellant's] acts [and] conduct [and] from the attendant circumstances" that he intended to start a fire and intended to defraud his insurance company. *Lewis*, 911 A.2d at 563-64. The jury found this evidence to be sufficient, and we will not substitute our judgment for theirs. *Haughwout*, 837 A.2d at 484. Therefore, we agree with the trial court that:

> While direct evidence of Appellant's intent, such as an unlikely admission by him that he intended to burn his house down for the insurance proceeds, was not available, the jury could reasonably conclude from circumstantial evidence derived from the expert witness testimony that Appellant carried out his motive and intentionally ignited the fire. As noted, those experts conducted a thorough analysis of the fire scene and systematically eliminated each of the potential causes of the fire. . . . Clearly, the totality of the circumstantial evidence provided a basis for the jury to reasonably conclude that Appellant had the requisite intent to create a fire inside his house[.]

TCO at 38. Thus, we conclude that Appellant's second issue merits no relief.

### Admissibility of Prior Bad Acts

Appellant next argues that the trial court "erred in granting the Commonwealth's motion to admit prior bad acts." Appellant's Brief at 37. Specifically, Appellant asserts "that the trial court erred when it ruled that

_____

[8] The investigator for Allstate testified that, had Appellant not been suspected of arson, he would have received a payment of $75,156.16 for damages in the 2014 fire.

evidence of a prior 2011 fire at the Appellant's house could be admitted." Appellant's Brief at 37.[9] He concludes that "[t]he only purpose in admitting this evidence was to prejudice the Appellant" and that the trial court thus "erroneously admitted evidence that was much more prejudicial than probative[.]" *Id.* at 38.

"The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion." ***Commonwealth v. Towles***, 106 A.3d 591, 603 (Pa. 2014) (citations omitted).

Evidence of crimes, wrongs, or other acts is controlled by Pa.R.E. 404(b)(1)-(2):

> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

---

[9] The evidence presented during the prior bad acts pretrial hearing and during trial demonstrated that there were two fires at Appellant's home in 2011. However, Appellant's Brief only references "a prior 2011 fire." Appellant's Brief at 37; ***see also id.*** at 38. Nevertheless, our analysis and the trial court's analysis applies equally to both 2011 fires.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Clyde W. Waite, we conclude that Appellant's third issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of that question as follows:

> As noted above, at the start of the trial, th[e trial c]ourt heard testimony regarding the Commonwealth's motion *in limine* to introduce evidence of the suspicious fire[s] that occurred [in] 2011 at Appellant's residence. Th[e trial c]ourt noted that Chief Sponheimer had determined both the March 19, 2011 fire and the instant February 10, 2014 fire were … incendiary,[10] and [the trial court] therefore reasoned that there was enough of a common basis and sufficient connection between the nature of the two fires that a fact-finder should be allowed to determine whether or not the prior act demonstrated motive, plan, or opportunity for obtaining financial gain. While the evidence the Commonwealth seeks to introduce is generally and intentionally prejudicial to a defendant, and in this instance the evidence of the prior fire was certainly prejudicial, it was not admitted to prove Appellant's character, but to reveal the existence of Appellant's knowledge of, familiarity with, and therefore ability to plan, prepare and carry out the arson of his residence. It was clear that the probative value of the evidence of the prior fire outweighed its prejudicial effect.

TCO at 39-40. Accordingly, with respect to Appellant's third issue on appeal, we affirm on the basis of the trial court's opinion.

_____

[10] We also note that the fire on March 19, 2011, like the 2014 fire, was ruled incendiary by Chief Sponheimer after he eliminated other possible, accidental sources, including discarded cigarettes or burned candles.

- 23 -

### Admissibility of Statements

Appellant further argues that "[t]he trial court erred in denying the defense motion to suppress a series of statements that were made to Detective Clark in this matter." Appellant's Brief at 39.

At the outset, we recite our standard of review:

> In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Scarborough*, 89 A.3d 679, 683 (Pa. Super. 2014) (citation and internal brackets omitted). In addition, "[o]ur scope of review is limited to the evidence presented at the suppression hearing." *Commonwealth v. Mackey*, ___ A.3d ___, 2017 PA Super 403, 2017 WL 6506599, at *2 (Pa. Super. Dec. 20, 2017) (citation omitted).

> It is a fundamental precept of constitutional law that a suspect subject to a **custodial** interrogation by police must be warned that he has the right to remain silent, that anything he says may be used against him in court, and that he is entitled to the presence of an attorney. *Miranda*, 384 U.S. at 469, 86 S.Ct. 1602. If an individual is not advised of those rights prior to a custodial interrogation, any evidence obtained through the interrogation is inadmissible at trial. *In re K.Q.M.*, 873 A.2d 752, 755 (Pa.Super.2005). The *Miranda* safeguards are triggered "whenever a person **in custody** is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 292, 100 S.Ct. 1682, 64 L.Ed.2d 297

(1980) ... (defining interrogation to include express questioning and its functional equivalent).

***Commonwealth v. Freeman***, 128 A.3d 1231, 1240 (Pa. Super. 2015) (emphasis added). If a defendant "was not in custody at the time he made the statements" to police, "no ***Miranda*** warnings were required."

***Commonwealth v. Davis***, 861 A.2d 310, 318 (Pa. Super. 2004).

> The Fourth Amendment of the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures. In Fourth Amendment jurisprudence, there are three categories of interactions between citizens and the police:
>
> The first category is a "mere encounter" (or request for information) which need not be supported by any level of suspicions, but carries no official compulsion to stop or respond. The second, an "investigative detention," must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Parker***, 161 A.3d 357, 362 (Pa. Super. 2017) (internal brackets, citations, and quotation marks omitted). When examining whether police contact constitutes a mere encounter or an investigatory detention, we employ the following precepts:

> To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officers' request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a

reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Commonwealth v. Collins*, 950 A.2d 1041, 1046–47 (Pa. Super. 2008) (*en banc*) (citation omitted) (holding that interaction between the petitioner and police was a mere encounter where the petitioner was approached in his parked car, in a public parking lot, by an officer with his police vehicle headlights activated).

> No constitutional provision prohibits police officers from approaching a citizen in public to make inquiries of them. However, if the police action becomes too intrusive, a mere encounter may escalate into an investigatory [detention] or seizure. The term 'mere encounter' refers to certain non-coercive interactions with the police that do not rise to the level of a seizure of the person under the fourth amendment. For example, a mere encounter transpires when an officer approaches a citizen on a public street for the purpose of making inquiries.
>
> In contrast, an investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes. In other words, in view of all the circumstances, if a reasonable person would have believed that he was not free to leave, then the interaction constitutes an investigatory detention.

*Commonwealth v. Cauley*, 10 A.3d 321, 325–26 (Pa. Super. 2010) (internal brackets, citations, and quotation marks omitted).

For the first interview on February 10, 2014, Appellant "came of his own free will" to the police station, "drove himself there, and after the interview he was allowed to leave and did leave." N.T., 1/28/15, at 75; *see also id.* at 81 (Appellant "left the police station on his own"), 83 (Appellant "got in his vehicle and followed" Detective Clark "to [the] station").

Detective Clark's purpose in conducting the first interview was "to gather information about the fire."  N.T., 1/28/15, at 89; **see also id.** at 88 (according to Detective Clark, Appellant was not "being interrogated").

When we analyze this police-citizen interaction, the fact that Appellant voluntarily went to the police station demonstrates that there was "no official compulsion to stop or respond," thereby indicating that this interview was a mere encounter.  **Parker**, 161 A.3d at 362.  Detective Clark did not engage in any "physical force or a show of authority for investigative purposes." **Cauley**, 10 A.3d at 325.  Detective Clark merely intended to "make inquiries" of Appellant, which is not prohibited by any constitutional provision.  **Id.**  Based upon the evidence confined to the suppression court record, **Mackey**, 2017 WL 6506599, at *2, we agree with the trial court's assessment that, "[c]learly, Appellant was not in custody and was free to leave at any time, and in fact did leave at his discretion."  TCO at 40; **see also** N.T., 1/28/15, at 110 (the trial court stated on the record that Appellant "was not in custody" and was not "a person whose freedom was restricted").

As for the second interview on February 12, 2014, Detective Clark originally arrived at the Extended Stay America Hotel to deliver a property receipt to Appellant for items that were taken from his home as part of the investigation and not to interview Appellant.  According to Detective Clark's testimony, had Appellant not been at the hotel, the detective would still have arranged for Appellant to receive the paperwork.  This second interview

took place in the open and public location of the hotel's parking lot as Appellant was leaving; Appellant was seated in his own automobile and chose to "roll[] his window down." N.T., 1/28/15, at 76. At no time during this second interview did Appellant state that he did not wish to speak with Detective Clark or request to speak with an attorney.

Based upon Detective Clark's testimony from the suppression court record only, *Mackey*, 2017 WL 6506599, at *2, Appellant was free to leave in his truck at any time during this second interview. No evidence was presented to suggest that "the police conducted a seizure" of Appellant, which would have elevated a mere encounter to the level of an investigatory detention. *See Collins*, 950 A.2d at 1046-47. Additionally, the interaction occurred in a parking lot, in public, while Appellant was in his own vehicle; a similar factual situation was found to be a mere encounter in *Collins*. *Id.* (concluding interaction was mere encounter where the defendant was approached by police in his parked car, in a public parking lot); *see also Cauley*, 10 A.3d at 325. Consequently, we agree with the trial court the evidence indicated that Appellant was not in custody during this second interview, either. TCO at 42 (the trial court "determined that Appellant had not been in custody at the time of his encounter with Detective Clark in the parking lot of the Extended Stay America Hotel").

Because Appellant was not in custody during either the first interview on February 10, 2014, or the second interview on February 12, 2014, no *Miranda* warnings were required. *Davis*, 861 A.2d at 318; *see also*

- 28 -

*Freeman*, 128 A.3d at 1240. Hence, we approve of the trial court's conclusion that "no *Miranda* warnings were required" in advance of either interview. TCO at 41; *see also* TCO at 42 ("clearly [Appellant] had not been detained or his freedom restricted in any manner at that time such that *Miranda* warnings were required" for the second interview). Appellant's fourth issue is thereby meritless.

**Admissibility of Expert Testimony**

Finally, Appellant argues that "[t]he trial court erred in denying the defense motion in limine to exclude testimony of expert witness." Appellant's Brief at 41.

Our standard of review for the challenges to the admission of expert testimony is as follows:

> The admission of expert testimony is a matter committed to the discretion of the trial court and will not be disturbed absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Nobles v. Staples, Inc.*, 150 A.3d 110, 113 (Pa. Super. 2016) (citations and internal quotation marks omitted).

Pennsylvania has specifically adopted the standard of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), with respect to scientific evidence – *i.e.*, such evidence must have "general acceptance" in the relevant scientific community. *See Commonwealth v. Dunkle*, 602 A.2d 830 (Pa. 1992);

***Commonwealth v. Topa***, 369 A.2d 1277 (Pa. 1977). Pa.R.E. 702

incorporates the ***Frye*** standard and now governs the admissibility of expert

testimony and scientific facts in Pennsylvania.[11] Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Here, Appellant has not challenged the "scientific, technical, or other

specialized knowledge" of either of the Commonwealth's expert witnesses,

Chief Sponheimer and Mr. Czajkowski, pursuant to Pa.R.E. 702(a)-(b); the

expert knowledge of both witnesses was accepted by the trial court without

any objection from defense counsel. The trial court therefore held a pretrial

hearing on Pa.R.E. 702(c) only, during which Appellant contended that the

methodology used by the Commonwealth's expert witnesses to determine

---

[11] The committee notes accompanying Pa.R.E. 702 state that the adoption of Rule 702 did not alter "Pennsylvania's adoption of the standard in ***Frye v. United States***, 293 F. 1013 (D.C. Cir. 1923). The rule applies the 'general acceptance' test for the admissibility of scientific, technical, or other specialized knowledge testimony. This is consistent with prior Pennsylvania law."

the cause of the fire was not approved by the National Fire Protection Association code, NFPA 921.[12]  Specifically, Appellant claimed that Chief Sponheimer and Mr. Czajkowski had used a "negative corpus," which he alleged is contrary to the scientific method.

However, Chief Sponheimer testified during the *Frye* hearing that the NFPA code does not state that "negative corpus" can never be used by investigators.  N.T., 1/28/15, at 141-42 (NFPA 921 "says **some** investigators believe this is negative corpus"; "[i]t does not say **all** investigators"; "it's appropriate for **some** investigators"; "the guide says **some** investigators feel this or refer to this as negative corpus, not **all**" (emphasis added)).

Mr. Czajkowski agreed with Chief Sponheimer and testified that NFPA 921 does not specifically exclude "negative corpus" or the lack of specific evidence as a potential avenue for fire investigation.  He explicitly stated that NFPA 921 permits an investigator's knowledge and experience to eliminate negative corpus and allows for the hypothesizing of an ignition source, even if one is not present.[13]

_____

[12] Chief Sponheimer later relied upon NFPA 921 during trial to support his opinion that the fire on March 19, 2011, was incendiary.  N.T., 1/30/15, at 180-82.  Mr. Czajkowski made no reference to NFPA 921 during trial.

[13] Even if the NFPA 921 did wholly exclude "negative corpus," Chief Sponheimer disagreed with Appellant's labelling of his procedure as such and explained during the *Frye* hearing why he believed Appellant had mischaracterized his approach.

Moreover, Appellant offered no evidence during the **Frye** hearing from any other expert witness that Chief Sponheimer's method should be properly categorized as a "negative corpus" or was in any other way unscientific and not generally accepted in the field of fire investigation. **See generally** N.T., 1/28/15, at 111-216.

Chief Sponheimer thereby articulated why his "methodology is generally accepted in [his] relevant field," Appellant offered no contradictory testimony, and this expert testimony was therefore properly admitted pursuant to Pa.R.E. 702(c). Thus, the trial court did not err in denying Appellant's motion *in limine* to exclude either Chief Sponheimer's or Mr. Czajkowski's expert opinion testimony, and Appellant's final issue has no merit.

Accordingly, Appellant's first issue is waived, and his remaining issues merit no relief. Consequently, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/18